**2023 UT App 126**

# THE UTAH COURT OF APPEALS

STATE OF UTAH, IN THE INTEREST OF A.S.G.-R.,
A PERSON UNDER EIGHTEEN YEARS OF AGE.

G.R.,
Appellant,
*v.*
STATE OF UTAH AND E.G.,
Appellees.

Opinion
No. 20220645-CA
Filed October 19, 2023

Fourth District Juvenile Court, Provo Department
The Honorable D. Scott Davis
No. 1196726

Alexandra Mareschal and Julie J. Nelson,
Attorneys for Appellant

Sean D. Reyes, Carol L.C. Verdoia, and John M.
Peterson, Attorneys for Appellee State of Utah

Neil D. Skousen, Attorney for Appellee E.G.

Martha Pierce, Guardian ad Litem

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER and RYAN D. TENNEY
concurred.

HARRIS, Judge:

¶1 G.R. (Mother) became convinced that E.G. (Father) was sexually abusing their daughter, A.S.G.-R. (Child). Over a nearly two-year period, Mother made or sparked some thirty reports of sexual abuse to Utah's Division of Child and Family Services (DCFS). After investigation, however, DCFS was unable to

discover any credible evidence supporting Mother's allegations, and therefore did not substantiate any of them. And given the number and repeated nature of the reports, DCFS became concerned that Child was being harmed by the allegations and ensuing investigations, some of which had included invasive physical examinations of Child.

¶2 Eventually, the State filed a petition for protective supervision and obtained an order removing Child from Mother's custody and placing her with Father. After affording Mother fifteen months of reunification services, including a psychological evaluation and therapy, the juvenile court determined that the services had not resulted in sufficient change to the situation and that Child would be placed at substantial risk if she were returned to Mother, and therefore terminated reunification services. And after a four-day permanency hearing, the court entered a permanent custody and guardianship order in favor of Father.

¶3 Mother now appeals, arguing that the court erred in its decisions to not extend reunification services and to award permanent custody and guardianship to Father. We discern no reversible error in those decisions, and therefore affirm.

BACKGROUND[1]

¶4 Child was born in January 2017. Mother and Father separated shortly before Child's birth, and about two years later they finalized their divorce. In the decree of divorce, Mother and Father were awarded joint legal custody of Child, but Mother was

---

1. "On appeal from a bench trial, we view and recite the evidence in the light most favorable to the trial court's findings." *In re B.H.*, 2020 UT 64, n.2, 474 P.3d 981 (quotation simplified).

awarded primary physical custody with Father having statutory parent-time.

¶5 Child welfare officials first became involved with this family in November 2018, when DCFS made a supported finding of domestic violence with Father as the perpetrator and Child as the victim. At some point during this same time frame, Mother obtained a protective order against Father, based on allegations that he committed domestic violence against her also.

¶6 Beginning in May 2019, Mother began to make accusations that Father was sexually abusing Child. Over the course of the next two years, Mother made at least eight direct reports to DCFS of alleged sexual abuse. In addition, Mother reported her allegations to various medical and mental health professionals, some of whom also made reports to DCFS based on Mother's representations. In total, between May 2019 and February 2021, some thirty separate reports were made to DCFS that Father was sexually abusing Child. DCFS investigated these reports and could not substantiate any of them. In connection with some of these reports, Mother took Child to the hospital. During two of these visits, Child—approximately three years old at the time—was subjected to invasive physical examinations, including one "code-R" rape examination.[2] The examinations yielded no evidence of abuse, and in January 2020 DCFS representatives spoke with Mother about the potential harm that could result to Child from repeated unfounded allegations and needless forensic medical examinations. In addition, in April 2020 the "medical

---

2. A "'code-R' or rape kit procedure" involves "a full body examination, swabs, photographs and collection of clothing or other items," and is typically performed by a "sexual assault nurse examiner (SANE)." *See Medical Resources, Sexual Assault Awareness & Response Support*, The University of Utah, https://sexualassault.utah.edu/get-help/medical-resources/ [https://perma.cc/FL4W-D29E].

director of Utah's [Center for] Safe and Healthy Families" program advised Mother that subjecting Child to "any further sexual assault examinations could result in an allegation of abuse for [Mother] due to the harm that unnecessary examinations can cause a child."

¶7 During this time frame, and in an effort to expand Mother's understanding of the relevant issues, DCFS opened a "voluntary services case" to provide Mother the opportunity to take advantage of certain services, and Mother agreed to work with DCFS to try to improve the situation.

¶8 During the pendency of the voluntary services case, however, Mother hired a private investigator to investigate the possibility of sexual abuse by Father, and she did not tell DCFS that she had done so. This investigator interviewed Child, using techniques the juvenile court later found to "violate[] nearly every guideline for child forensic interviewing," including "ask[ing] leading questions, [making] promises to [Child] that could not be kept, and offer[ing Child] ice cream if she would tell the interviewer what 'daddy's secret' is."

¶9 Despite DCFS's efforts to assist Mother, the voluntary services case did not have its desired effect. Mother proved unable or unwilling to follow the plan DCFS outlined, and she stopped communicating with the DCFS caseworker.[3] Eventually, DCFS closed the voluntary services case.

¶10 Sometime after that case was closed, Mother—in a continuing effort to present evidence that Father was sexually abusing Child—took a video recording of Child in an incident the

---

3. Mother's native language is not English. Mother believes that, at times, the language barrier has impaired her ability to communicate effectively with DCFS, despite certified interpreters being used when necessary.

juvenile court described as follows: Mother "videotaped [Child], naked on a bed, having her point to where [Father] touches her. On the video, [Mother] touches [Child's] genitals and has her spread her legs and moves the camera angle close-up to [Child's] genitals." Mother provided a copy of this recording to DCFS, but caseworkers declined to view it "based on concerns that it may potentially contain child pornography." Mother then provided the video recording to law enforcement.

¶11    In January 2021, Mother again brought Child to a hospital, alleging that Child "disclosed that [Father] had put his mouth on [Child's] vagina just hours prior." Another invasive physical examination was performed on Child, yet "no male DNA was found on [Child's] genitals." DCFS was informed about this incident, presumably from hospital personnel, and investigated it; the investigation included interviewing Child at the Children's Justice Center. After completing its investigation, DCFS found "no corroborating evidence" and concluded that Child's "disclosure was coached" and "not credible."

¶12    The present case was initiated in March 2021 when Mother sought a protective order barring Father from having contact with Child, and the State responded by not only intervening in the protective order case but also by filing this action: a petition for protective supervision services in which the State asked the court to "discontinue" the protective order, conclude that Child was "abused, dependent, and/or neglected," award DCFS protective supervision of Child, and allow DCFS to place Child in Father's custody during the pendency of the case.

¶13    At a shelter hearing held about a week later, the juvenile court ordered Child removed from Mother's custody and placed in the temporary custody of DCFS, which then placed Child, on a preliminary basis, with Father. Child has remained in Father's care ever since.

¶14   Later, at a subsequent hearing, the court found, based on stipulation, that Child was dependent as to Father. With regard to Father, the court indicated that the primary permanency goal was "Reunification/REMAIN HOME," and that the concurrent goal was "Remain Home with non-custodial parent."

¶15   The court held an adjudication hearing as to Mother; at that hearing, Father and the guardian ad litem (the GAL) asserted that Mother's conduct—making repeated false claims of sexual abuse, thereby subjecting Child to interviews, investigations, and physical examinations—constituted abuse, but the State argued only for a finding of neglect. After the hearing, the court found "no specific evidence" of harm to Child that could support a finding of abuse, but instead determined that Child "is neglected" as to Mother because Child "lacks proper care by reason of the fault or habits of [Mother]." For Mother, the court set a primary permanency goal of "RETURN HOME" and a concurrent permanency goal of "Permanent Custody and Guardianship with a Relative." The court explained that it was setting "different permanency goals for each parent," and that for Father, "the primary goal will be" for Child to "remain[] home with him," with "the concurrent goal of reunification if she is removed from his care." For Mother, the primary goal was "reunification, with the concurrent goal of guardianship with [a] relative."

¶16   In connection with setting these permanency goals, the court adopted a Child and Family Plan (the Plan). Under the terms of the Plan, Mother was required to, among other things, "complete a psychological evaluation and follow through with all recommendations"; "participate in individual therapy"; participate in a "parenting class"; and "maintain stable and appropriate housing" for herself and Child. The Plan also required Mother to be "open and honest" in connection with the psychological evaluation, as well as with therapists and other mental health professionals. The Plan provided that its objectives would "be achieved when [Child] is living at [Mother's] home"

and when Mother "is providing a healthy, stable, and age-appropriate environment . . . that supports a strong co-parenting relationship with" Father. No party lodged any objection to the terms of the Plan or to the permanency goals the court set.[4]

¶17 Thereafter, Mother completed a parenting class as well as—after some delay that may or may not have been attributable to her—the required psychological evaluation. The psychologist who conducted the evaluation (Evaluator) diagnosed Mother with "unspecified personality disorder" characterized by "symptoms indicative of borderline, histrionic, and narcissistic personality disorders as well as paranoid-like features." In particular, Evaluator noted that Mother has "a belief that she can only be understood by a few people," a "sense of entitlement," a "lack of empathy," and a "pervasive distrust and suspiciousness of others" that leads her to sometimes "suspect[], without sufficient basis, that others are harming and deceiving her." Evaluator offered his view that, "unless [Mother] overcomes her psychopathological features," she "cannot act in [Child's] best interest." He noted that the "obvious recommendation" for Mother would be for her to "pursue an effective treatment program," but he was doubtful that such a program would succeed in Mother's case, because Mother "is convinced that she is not the problem" and because, "given her personality disorder features, . . . it would be hard for [Mother] to develop an effective psychotherapeutic alliance with her psychotherapist."

---

4. The Plan applied to Father as well, and required him to, among other things, complete a psychological evaluation and participate in parenting classes. But because Child had already been placed with Father by the time the Plan was put in place, no party to this case describes Father's obligations under the Plan as "reunification services." Indeed, Mother acknowledged, at oral argument before this court, that Father was not ordered to complete any "reunification services."

¶18 Thereafter, DCFS sent Mother a list of recommended therapists, and Mother attended therapy sessions with at least three different mental health professionals. DCFS expressed concern that Mother "was seeking out multiple providers," some of whom reported that Mother was attempting to "get a second opinion on the psychological evaluation," and DCFS was worried that Mother was "continu[ing] to report" to these therapists "that [Child] was being sexually abused." Because of this, DCFS harbored a "concern that there is no clear progress in therapy, due to minimal communication from providers, multiple providers involved and regular changes in therapy." Mother maintains, however, that she "engaged in all recommended therapy," an assertion no party apparently contests, although the record is far from clear about what the specific recommendations were and exactly how Mother complied with them.

¶19 After the psychological evaluation was completed, the parties appeared for a review hearing before the court. At that hearing, the results of the evaluation were discussed, and the court commented that, "if the case were closed today and things returned to how they were before the case, [Child] would be at risk of harm by" Mother. The court ordered that Child remain in DCFS custody and placed with Father, with whom the court stated it had "no safety concerns."

¶20 As the twelve-month permanency hearing approached, Mother moved for an extension of reunification services for "at least 90 days." Mother argued that she had complied with the Plan, in that she had completed the parenting class and the psychological evaluation and had engaged in therapy. In this motion, Mother also argued that the juvenile court could not enter an order of permanent custody and guardianship with Father, because the district court had already entered a custody order, in connection with the parties' divorce case, and in Mother's view the district court should be the court to enter and modify custody orders between the parents. Father opposed Mother's motion for

extended services, but the State did not register opposition. The court scheduled an evidentiary hearing to consider the matter. But due to problems with witness subpoenas, the evidentiary hearing needed to be postponed, which resulted in Mother's motion for an extension of services being de facto granted: services were then extended for another ninety days, and the postponed evidentiary hearing was turned into a permanency hearing.

¶21 After these delays, the permanency hearing was held, over four nonconsecutive trial days, in April and June 2022. Child's DCFS caseworker testified that she believed that Mother had been "coaching [Child] into telling people certain things." And Child's psychologist testified that she "did not observe significant behaviors or concerns, [or] emotions concerning expressions that would signal to [her] that [Child] has experienced sexual abuse."

¶22 Evaluator testified at length during the trial, and discussed the specifics of his evaluation of Mother. He discussed his diagnosis that Mother had an "unspecified personality disorder." He testified that the evaluation took longer than anticipated because Mother "did not involve herself in the evaluation in a forthright manner," "withheld relevant information that was requested of her," and "intentionally distorted information." In his view, Mother did not think that she was the problem or that she had done anything wrong. Evaluator reiterated his view that unless Mother "overcomes her psychopathological features, [she] cannot act in [Child's] best interest."

¶23 During her own testimony, Mother continued to cling to her viewpoint that Father had been sexually abusing Child. She testified that "she does not agree with a doctor's opinion that there was no evidence of sexual abuse." When asked whether she "still believe[d]" that Father had sexually abused Child, she answered that she did not know, but that some "part of [her]" still believed that abuse took place, and that she still had "a suspicion" in that regard. She did not recognize any impropriety in her

multiple reports of sexual abuse to DCFS and other authorities, testifying that she did not "think [she] was doing anything incorrectly" regarding the parenting of Child. And she did not agree that her behavior constituted neglect of Child.

¶24 In this same vein, Mother also called her ongoing therapist to testify at the trial. The therapist testified that he had spent some thirty hours of therapy with Mother and that she had been cooperative. The therapist opined, to the extent he was able to as a fact witness, that Evaluator's diagnosis of an "unspecified personality disorder" was incorrect, that Mother had not neglected Child by reporting sexual abuse to the authorities, and that Father had indeed sexually abused Child.

¶25 At the conclusion of the trial, the juvenile court took the matter under advisement. A few weeks later, the court issued a written decision containing several different rulings. First, the court declined Mother's invitation to further extend reunification services, and it terminated those services. Important to the court's decision in this regard were its findings that—although Mother had taken certain steps, including completing parenting classes, engaging in therapy, and completing the psychological evaluation—Mother had not fully complied with the terms of the Plan, because even after all of these services, Mother "accepted virtually no responsibility for [Child] being in DCFS custody for more than one year," "demonstrated virtually no insight regarding the harm she has caused" to Child, and offered "varied and conflicted" testimony "regarding whether she still believed" that Father had sexually abused Child, "despite there being no credible evidence that he has." The court also determined that reunification between Mother and Child was not "probable or likely within the next 90 days" and that the extension of services was not in Child's best interest.

¶26 Second, the court awarded "permanent custody and guardianship" of Child to Father. Important to the court's

decision in this regard were its findings that "return of [Child] to [Mother's] care would create a substantial risk of detriment to [Child's] physical or emotional well-being," that there is "no credible evidence" that Father has ever sexually abused Child, and that Child "seems to be thriving and well-adjusted [and] well cared for" in Father's care.

¶27 Finally, after denying Mother's request for additional reunification services and granting permanent custody and guardianship in favor of Father, the court terminated its jurisdiction in the case.

ISSUES AND STANDARDS OF REVIEW

¶28 Mother now appeals, and she raises two issues for our consideration. First, she challenges the juvenile court's decision to terminate reunification services. The juvenile court is "in the best position to evaluate the credibility of witnesses, the parent's level of participation in reunification services, and whether services were appropriately tailored to remedy the problems that led to the child's removal." *In re D.R.*, 2022 UT App 124, ¶ 9, 521 P.3d 545 (quotation simplified), *cert. denied*, 525 P.3d 1264 (Utah 2023). Accordingly, "absent a demonstration that the determination was clearly in error, we will not disturb the determination" to terminate reunification services. *See id.* (quotation simplified).

¶29 Second, Mother challenges the juvenile court's decision to award permanent custody and guardianship to Father, her fellow parent. As part of this challenge, she takes issue with the court setting slightly different permanency goals for each parent, and with the court accomplishing two separate objectives—namely, choosing among those goals and awarding permanent custody to Father—all in connection with the same hearing. In the main, Mother's challenges in this regard involve questions of statutory interpretation, which "are questions of law that we review for

correctness." *In re S.Y.T.*, 2011 UT App 407, ¶ 9, 267 P.3d 930 (quotation simplified). But to the extent that Mother here challenges the court's underlying factual findings, we adopt a more deferential standard of review. *See In re L.M.*, 2013 UT App 191, ¶ 6, 308 P.3d 553 ("We review the juvenile court's factual findings for clear error . . . ." (quotation simplified)), *cert. denied*, 320 P.3d 676 (Utah 2014).[5]

## ANALYSIS

### I

¶30     Mother first challenges the juvenile court's decision to terminate reunification services. For the reasons discussed, we discern no clear error in the court's decision.

¶31     When a juvenile court removes a child from a parent's custody, it may afford the parent the opportunity to take advantage of certain services—e.g., mental health counseling or parenting classes—designed to address the problems that led to removal and aimed at facilitating reunification between parent and child. *See* Utah Code § 80-3-406. However, due to the need for

---

5. The GAL argues that Mother invited several of the errors she now assails, and Father asserts that several of Mother's issues are not properly preserved for appellate review. We reject the GAL's arguments that Mother invited any error. And where "the merits of a claim can easily be resolved in favor of the party asserting that the claim was not preserved, we readily may opt to do so without addressing preservation." *State v. Kitches*, 2021 UT App 24, ¶ 28, 484 P.3d 415 (quotation simplified), *cert. denied*, 496 P.3d 718 (Utah 2021). We therefore proceed to address, and reject, Mother's arguments on their merits. And because we reject Mother's arguments, we need not address Father's invitation that we affirm on an alternative basis.

swift permanence in child welfare cases, the duration of reunification services may not ordinarily "exceed 12 months" from the date of removal. *See id.* § 80-3-406(13)(a); *see also id.* § 80-3-409(6). A juvenile court may, however, extend reunification services by an additional "90 days"—for a total of fifteen months—if the court finds, by *a preponderance of the evidence*, "that (i) there has been substantial compliance with the child and family plan; (ii) reunification is probable within that 90-day period; and (iii) the extension is in the best interest of the minor." *Id.* § 80-3-409(7)(a). And in exceptional cases, the court may extend services for a second ninety-day period—for a total of eighteen months—but only if the court can make those same three findings by *clear and convincing evidence. Id.* § 80-3-409(7)(c).

¶32 In this case, Child was removed from Mother's custody at a shelter hearing in March 2021. Thus, reunification services were to presumptively end in March 2022, unless the court made findings sufficient to support an extension. In early April 2022, the court commenced an evidentiary hearing for the purpose of determining whether reunification services should be terminated or extended but, due to problems with witness subpoenas, the evidentiary hearing needed to be postponed, which resulted in a de facto extension of reunification services for another three months, into June 2022. Finally, at the conclusion of the four-day hearing that same month, the court ordered that reunification services be terminated. In its order, the court—presumably out of an abundance of caution given the timing of the hearing—stated that it was "not able to find by a preponderance of the evidence, and certainly not by clear and convincing evidence, that [Mother] is in substantial compliance with [the Plan], that reunification . . . is probable or likely within the next 90 days, or that extension of services for [Mother] is in [Child's] best interest."

¶33 Mother challenges this decision, asserting that it goes against the clear weight of the evidence because, she asserts, she at least substantially complied with the Plan. We acknowledge

that Mother did take certain actions that the Plan required, such as completing the psychological evaluation and participating in parenting classes and individual therapy, and we therefore agree with Mother's assertion that she complied with many—if not necessarily all[6]—of the Plan's individual requirements.

¶34 But even taking Mother's assertion—that she completed all of the Plan's individual subsidiary tasks—at face value, that does not necessarily compel the conclusion that Mother substantially complied with the Plan, because in this case Mother's efforts did not bear fruit. That is, at the end of fifteen months of reunification services, Mother had not rectified the problem that led to the removal of Child from her custody. The Plan explicitly stated that its goals would be "achieved when [Child] is living at [Mother's] home [and] where Mother is providing a healthy, stable, and age-appropriate environment . . . that supports a strong co-parenting relationship with [Father]." Child was removed from Mother's custody because Child lacked "proper care by reason of the fault or habits of [Mother]" due to Mother's continued unsupported reports to authorities that Father was sexually abusing Child. After fifteen months of services, the court—based at least in part on Mother's own testimony at the evidentiary hearing—determined that the original problem still existed, and that Child could not therefore safely be returned to Mother's custody. It is far from clear error for a juvenile court to determine that a parent who has completed many of a child and family plan's individual requirements, but who has still not meaningfully addressed the

---

6. For instance, the Plan required Mother to be honest with Evaluator, but Evaluator testified that Mother "did not involve herself in the evaluation in a forthright manner," "withheld relevant information that was requested of her," and "intentionally distorted information." However, the juvenile court made no specific finding regarding Mother's honesty in her dealings with Evaluator, so we do not further discuss this point.

underlying problem the plan was designed to solve, has not substantially complied with the plan.

¶35 Moreover, even if we were to assume, for the purposes of the discussion, that Mother's actions constituted substantial compliance with the Plan, Mother must also grapple with the juvenile court's findings that reunification was not probable within the next ninety days, and that another extension of reunification services was not in Child's best interest. *See* Utah Code § 80-3-409(7)(a)(ii), (iii); *see also In re H.C.*, 2022 UT App 146, ¶ 54, 523 P.3d 736 ("Although [the mother] subsequently complied with the child and family plan, the court nonetheless determined that [the child] could not safely be returned to her care because it found that the return posed a substantial risk of detriment to [the child's] physical or emotional well-being."), *cert. denied*, 527 P.3d 1106 (Utah 2023). While Mother spends many pages in her brief contesting the court's "substantial compliance" finding, she does not directly engage with the court's findings that, given her lack of progress on solving the underlying problem, she had not shown—by either evidentiary standard— that reunification was probable in the next ninety days or that reunification was in Child's best interest. And based on our review of the record, we discern no clear error in these findings.

¶36 Accordingly, we discern no error, let alone reversible error, in the juvenile court's decision to terminate reunification services.

II

¶37 Next, Mother challenges the juvenile court's decision to award permanent custody and guardianship to Father. Her challenge in this regard is multi-faceted. First, she challenges the *substance* of the court's decision, and asserts that the court—by considering its options limited to those set forth in section 80-3-409(4)(b) of the Utah Code—erred in its interpretation of the governing statute. And in connection with this argument, Mother

asks us to overrule one of our recent opinions. Second, Mother challenges the *procedure* the court used in reaching its decision. For the reasons discussed, we reject Mother's arguments.

A

¶38 Under our law, in any case in which reunification services are ordered, "the juvenile court shall, at the permanency hearing, determine . . . whether the minor may safely be returned to the custody of the minor's parent." *See* Utah Code § 80-3-409(2)(a). And "[i]f the juvenile court finds, by a preponderance of the evidence, that return of the minor to the minor's parent would create a substantial risk of detriment to the minor's physical or emotional well-being, the minor may not be returned to the custody of the minor's parent." *Id.* § 80-3-409(2)(b).

¶39 In this case, as already discussed, the juvenile court ordered reunification services for Mother, and therefore needed to confront, at the permanency hearing, the question of whether Child faced "substantial risk of detriment to her physical and emotional well-being if returned to [Mother's] care." In its findings and conclusions entered following that hearing, the court specifically found, by "both a preponderance of the evidence" and by "clear and convincing evidence, that return of [Child] to [Mother's] care would create a substantial risk of detriment to [Child's] physical or emotional well-being." Mother does not directly challenge that finding on appeal.[7]

---

7. As noted already, Mother does challenge the court's termination of reunification services, thus implicitly arguing that, given additional services, Mother could perhaps get to a point where return of Child to her care would not pose a substantial risk of detriment to Child's well-being. But she mounts no direct challenge to the court's finding that, as of the date of the

(continued…)

¶40 In situations where a juvenile court makes a finding of risk and therefore determines that a child cannot be returned to the parent's custody, our law then requires the court to do certain things: "(a) order termination of reunification services to the parent; (b) make a final determination regarding whether termination of parental rights, adoption, or permanent custody and guardianship is the most appropriate final plan for the minor . . . ; and (c) . . . establish a concurrent permanency plan that identifies the second most appropriate final plan for the minor, if appropriate." *Id.* § 80-3-409(4). As discussed above, the court terminated reunification services, and did not err by so doing.

¶41 The court then considered the three options presented by the second part of the governing statute: termination of parental rights, adoption, or permanent custody and guardianship.[8] *See id.* § 80-3-409(4)(b). The court determined that permanent custody and guardianship with Father was the most appropriate of those three options.

¶42 Mother challenges the substance of this determination, and she makes two specific arguments. First, she asserts that the statutory subsection the court believed governed the situation— section 80-3-409(4) of the Utah Code—doesn't actually govern, because in Mother's view Child was "returned to" a parent

---

permanency hearing, return of Child to her care would create a substantial risk of detriment to Child's well-being.

8. Mother asserts that these three options are, in reality, only two options because, in order to facilitate an adoption, the parent's rights must first be terminated. The State acknowledges that, in many cases, the three options will indeed collapse into just two, but notes that this will not always be the case; it specifically points to "cases in which termination of parental rights is warranted even where no adoption is contemplated," such as in cases of sexual abuse by the parent in question.

(Father) after the permanency hearing. Second, and relatedly, Mother acknowledges that one of our recent decisions—*In re H.C.*, 2022 UT App 146, 523 P.3d 736, *cert. denied*, 527 P.3d 1106 (Utah 2023)—interpreted the governing statute in a manner unfavorable to her, and she asks us to overrule that recent case. We find neither of Mother's arguments persuasive.

1

¶43　Mother's first argument challenges the juvenile court's interpretation of statutory text. In particular, she notes that a threshold requirement of the governing statute is that the minor not be "returned to the minor's parent or guardian at the permanency hearing." *See* Utah Code § 80-3-409(4). Only if a child is not "returned to the minor's parent" at the permanency hearing does a court need to choose from one of the three options set forth in subsection (4)(b): termination, adoption, or permanent custody and guardianship. *See id.* If a child *is* "returned to the minor's parent," then a court presumably could select some other option not listed in subsection (4)(b). As Mother sees it, the statutory reference to "the minor's parent" includes not only the parent from whom the child was removed and with regard to whom the "substantial risk" determination is being made, but also the child's other parent. And she asserts that, because Child was placed in the custody of Father—Child's other parent—after the permanency hearing, the court erred by considering itself limited to the three options set out in subsection (4)(b).

¶44　Our "overarching goal" in interpreting a statute is "to implement the intent of the legislature." *See State v. Rushton*, 2017 UT 21, ¶ 11, 395 P.3d 92. In attempting to ascertain that intent, we start with "the language and structure of the statute." *Id.* "Often, statutory text may not be plain when read in isolation, but may become so in light of its linguistic, structural, and statutory context." *Id.* (quotation simplified). "The reverse is equally true: words or phrases may appear unambiguous when read in

isolation, but become ambiguous when read in context." *Id.* For this reason, "we read the plain language of the statute as a whole, and interpret its provisions in harmony with other statutes in the same chapter and related chapters, avoiding any interpretation which renders parts or words in a statute inoperative or superfluous in order to give effect to every word in the statute." *Id.* (quotation simplified).

¶45 In our view, the phrase "the minor's parent," as used in section 80-3-409(4), refers only to the parent from whom the child was removed, who was offered reunification services, and to whom return of the child "would create a substantial risk of detriment" to the child. It does not refer to another parent with whom the child is currently placed, who has not been ordered to complete any reunification services, and with regard to whom the court has not made any "substantial risk" determination. Indeed, the thrust of this entire statutory section has to do with whether a child will be reunited with a parent from whom the child has been removed and who has received reunification services. *See* Utah Code § 80-3-409. As already noted, subsection (2) requires a court to make a threshold determination about whether the "minor may safely be returned to the custody of the minor's parent," something that may not occur if "return of the minor to the minor's parent would create a substantial risk of detriment" to the minor. *Id.* § 80-3-409(2)(a), (b). The verb "returned" is meaningful here: one does not "return" to a situation in which one has never been in the first place. *See Return*, Merriam-Webster, https://www.merriam-webster.com/dictionary/return [https://perma.cc/Y4YF-3ENP] (defining "return" as "to go back or come back again"). In the subsection (2) context, the phrase "the minor's parent" clearly refers to the parent from whom the minor was removed, who received reunification services, and with regard to whom the "substantial risk" determination is being made; indeed, the statute instructs juvenile courts that are making the subsection (2)

threshold determination to consider, among other things, whether the parent in question has demonstrated "progress" and whether the parent has "cooperated and used the services provided." *See* Utah Code § 80-3-409(3)(a)(iv), (v). In our view, it would be nonsensical to apply this phrase to the minor's other parent in a situation where the child was already in the custody of that parent at the time of the permanency hearing, where that parent did not receive reunification services, and where the court made no "substantial risk" determination concerning that parent at that hearing. Indeed, at oral argument before this court, Mother conceded that the phrase "the minor's parent," as used in subsection (2), must refer solely to the parent who received reunification services and with regard to whom the "substantial risk" determination is being made.

¶46 That same phrase—"the minor's parent"—used two subsections later means the same thing. As noted, we read statutes as a whole, including all of their subsections, and "interpret [their] provisions in harmony with other statutes in the same chapter and related chapters." *See Rushton*, 2017 UT 21, ¶ 11 (quotation simplified). Under "the canon of consistent meaning," there is a "presumption that the established meaning of a word in a given body of law carries over to other uses of the same term used elsewhere within that same law." *In re Childers-Gray*, 2021 UT 13, ¶ 142, 487 P.3d 96 (Lee, J., dissenting). And the "canon of consistent meaning is at its strongest when it is applied to a term used in neighboring subparts of the same statutory provision." *Irving Place Assocs. v. 628 Park Ave, LLC*, 2015 UT 91, ¶ 21, 362 P.3d 1241; *see also Barneck v. Utah Dep't of Transp.*, 2015 UT 50, ¶ 31, 353 P.3d 140 (determining that a term "cannot properly mean one thing as applied to two of the objects in a series . . . but something else as applied to the other object in the same series"). Thus, when assessing the meaning of the phrase "the minor's parent" in subsection (4), it is highly relevant how that phrase is used in subsection (2). And we conclude that, interpreted in its proper

context, the phrase—as used in subsection (4) as well as subsection (2)—refers only to the parent from whom the child was removed, who received reunification services, and with regard to whom the court is making the "substantial risk" determination, and not to another parent who does not fit those criteria.

¶47   Accordingly, we reject Mother's argument that subsection 409(4) has no application to her situation. By the plain terms of that statutory section, the juvenile court—as soon as it determined that Child could not safely be returned to Mother—was obligated to apply that statutory subsection according to its text.

2

¶48   Under the text of that statutory subsection, a court that has made a "substantial risk" determination must terminate reunification services. *See* Utah Code § 80-3-409(4)(a). At that point, the statute requires the court to "make a final determination regarding whether termination of parental rights, adoption, or permanent custody and guardianship is the most appropriate final plan for the minor." *Id.* § 80-3-409(4)(b). The language of this statutory subsection therefore speaks of only three options, and requires the court in this situation to choose one of them. And we have recently interpreted this language according to its text, even as applied to disputes between parents. *See In re H.C.*, 2022 UT App 146, 523 P.3d 736, *cert. denied*, 527 P.3d 1106 (Utah 2023).

¶49   Yet here, Mother nevertheless asserts that, at least in cases involving disputes between two parents, juvenile courts ought to be allowed to choose a different option: entry of a simple custody order that is controlled by the usual standards governing entry and modification of custody orders in divorce court. Mother asserts that awarding a parent the status of "guardian" makes no sense, given that a parent already has all the rights that a guardian has. And she asserts that entering orders of permanent guardianship as between parents has the effect—one she posits

was unintended—of preventing one parent from being able to seek modification of the custody order.

¶50    To her credit, Mother recognizes that our recent holding in *In re H.C.* forecloses her argument for a fourth option. In that case, the parents of a child were divorced, with a parenting plan that gave primary custody to the mother. *Id.* ¶ 2. But later, the juvenile court determined that the child had been neglected by the mother, and the child was placed in the care of the father. *Id.* ¶¶ 4, 8. After the permanency hearing, the juvenile court determined that the child would be at substantial risk if returned to the mother's custody, and the court placed the child with the father under an order of permanent custody and guardianship. *Id.* ¶¶ 28, 38. On appeal, we affirmed the juvenile court's decision, and we interpreted subsection 409(4)(b) as limiting the juvenile court to the three options set forth therein. *Id.* ¶ 58. We held that subsection 409(4)(b) "leaves a juvenile court judge with no discretion" to do anything else, and we specifically stated that the statute "does not vest the juvenile court with the authority to defer to the district court" with regard to custody of the adjudicated child. *Id.* (quotation simplified).

¶51    In an effort to get around this roadblock, Mother asks us to overrule *In re H.C.* We do possess the authority to overrule our own precedent in appropriate cases. *See State v. Legg*, 2018 UT 12, ¶ 11, 417 P.3d 592 (stating that one panel of this court "retains the right to overrule another panel's decision if the appropriate standard is met"). "But we do not do so lightly," given our respect for the principle of stare decisis, which ordinarily requires us to defer to "the first decision by a court on a particular question." *See State v. Garcia-Lorenzo*, 2022 UT App 101, ¶¶ 42, 44, 517 P.3d 424 (quotation simplified), *cert. granted*, 525 P.3d 1263 (Utah 2022).

¶52    "Before we may overrule one of our precedents, we must engage in the two-part exercise required by our supreme court in such situations." *Id.* ¶ 45. "First, we must assess the correctness of

the precedent, and specifically examine the persuasiveness of the authority and reasoning on which the precedent was originally based." *Id.* (quotation simplified). "Second, we must assess the practical effect of the precedent, including considerations such as the age of the precedent, how well it has worked in practice, its consistency with other legal principles, and the extent to which people's reliance on the precedent would create injustice or hardship if it were overturned." *Id.* (quotation simplified). Both parts of the test must be satisfied before we may overrule a precedent. *See id*. In this case, we need not discuss the second part because, in our view, the first one is not satisfied.

¶53 With regard to the first part—the correctness of the precedent—Mother asserts that our decision in *In re H.C.* "upends the district court's jurisdiction over custody matters and imposes an unnecessarily restrictive scheme on custody between two parents." She points out that, when a child is placed with the other parent after a permanency hearing, "the child isn't in 'legal limbo'" and "all that is left to determine is what [the] custody [arrangement] *between the parents* will look like." And she maintains that, if subsection 409(4)(b) is interpreted to require courts to order permanent custody and guardianship in favor of one of the parents, that result would serve to "override[] district court custody orders" and would create a "super sole custody" arrangement in which "the non-guardian parent can never modify the terms of the guardianship." She asserts that this is an "absurd result" that "cannot be what the legislature intended."

¶54 But in our view, the panel's reasoning in *In re H.C.* was sound. There, the court analyzed the text of subsection 409(4)(b) and concluded that the language used by the legislature limited juvenile courts in this situation to the three options set forth in the text of the statute. *See In re H.C.*, 2022 UT App 146, ¶¶ 58–59. Our analysis of that same text leads us to the same conclusion.

¶55    Moreover, Mother overlooks the fact that the panel in *In re H.C.* considered many of the same arguments that Mother is advancing here. In that case, the appellant asserted that "juvenile courts should not be deciding custody between two fit parents." *Id.* ¶ 52 (quotation simplified). And the appellant complained that an order of permanent custody and guardianship in favor of the other parent may prevent her "from petitioning for custodial change in the future." *Id.* ¶ 53. We rejected these arguments, in part, by noting that, given the court's adjudication rulings, "this was not merely a custody proceeding 'between two fit parents.'" *Id.* ¶ 54. And we acknowledged the remainder of these arguments in a footnote, editorializing that "it seems odd that, in a situation such as this with two parents vying for custody of a minor child, the statute authorizes the award of permanent guardianship to one parent over the other, where both enjoy parental rights in the minor child." *Id.* ¶ 59 n.13. But we found these arguments nevertheless unpersuasive in light of the text of the "statutory regimen that we [were] called upon to interpret and apply." *Id.*

¶56    We share the sentiment of the panel in *In re H.C.* that the text of the governing statute compels the interpretation described there. The text selected and enacted by our legislature limits juvenile courts to just three options in this situation. *See id.* ¶¶ 58–59 & n.13 (stating that "permanent custody and guardianship is one of only three options available by the terms of the controlling statute when parental neglect has triggered the juvenile court's jurisdiction and the case progresses to a permanency hearing at which parental neglect is found and reunification services are terminated"). If our legislature intended a different result, it can always amend the statute to provide for additional options—for instance, entry of a simple custody order awarding primary physical custody to the other parent, and allowing the district court to manage things from there—that a juvenile court might be able to apply in cases involving disputes between two parents. But for now, the text of the governing statute speaks of only three

options, applicable in all cases, and we must apply the statute as written, Mother's policy arguments notwithstanding.[9]

¶57     For all of these reasons, we decline Mother's invitation to overrule *In re H.C.* That case—and the statutory text interpreted therein—compels the conclusion that the juvenile court, in this case, had only three options after concluding that it could not return Child to Mother's custody: it had to either (a) terminate Mother's parental rights, (b) work toward adoption, or (c) enter an order of permanent custody and guardianship with someone other than the parent at issue. *See* Utah Code § 80-3-409(4)(b); *see also In re H.C.*, 2022 UT App 146, ¶¶ 58–59. The juvenile court, by selecting permanent custody and guardianship in favor of Father, chose one of the available options.[10] In so doing, the court

---

9. Contrary to Mother's arguments, a legislative choice to limit a juvenile court's options in cases like this one does not strike us as absurd. As noted, we already rejected—in *In re H.C.*—the notion that these situations involve "two fit parents." *See In re H.C.*, 2022 UT App 146, ¶ 54, 523 P.3d 736, *cert. denied*, 527 P.3d 1106 (Utah 2023). Where the child in question is a child adjudicated to be within the jurisdiction of the juvenile court by reason of abuse, neglect, or dependency, there exist policy-based reasons to place additional restrictions on a parent's ability to reinitiate or resume custody of the child in question. It is of course not our role, in matters of statutory interpretation, to decide between reasonable policy options; we note only that enactment of a statute interpreted along the lines set forth by *In re H.C.* would be supported by at least some reasonable policies, and would not be a definitionally absurd policy choice.

10. Mother, for obvious reasons, does not challenge the juvenile court's choice, as between the three options. From her perspective, imposing a permanent custody and guardianship arrangement is preferable to termination of her parental rights.

properly followed the governing statute, and did not misinterpret it. We therefore reject Mother's second substantive argument.

B

¶58 Finally, Mother makes two challenges to the procedure the juvenile court employed in arriving at its conclusion to award permanent custody and guardianship to Father. We reject both challenges.

¶59 First, Mother claims that the court acted inappropriately when it took the following two actions in the same ruling and after the same hearing: (a) it changed Child's final permanency goal to permanent custody and guardianship and (b) it entered an order effectuating the permanent custody and guardianship. As Mother sees it, the court was required "to first change the permanency goals . . . and then hold a review hearing (possibly another evidentiary hearing) to determine whether the final permanency goal is established." Mother notes that "nothing in section 409 permits a juvenile court to" accomplish both things in the same ruling and after the same hearing. But Mother cites no statute or appellate opinion *forbidding* the court from doing so and, in this situation, we see no reason why the court could not have proceeded as it did.

¶60 Had the court chosen "adoption" as the primary permanency goal following the permanency hearing, then perhaps Mother would have a point: as a practical matter, setting adoption as the goal entails a fair bit of extra work. To facilitate an adoption, the parent's rights would need to be terminated, and to make that happen, the State (or another petitioner) would need to file a petition for termination of parental rights, which would need to be litigated. And the juvenile court would also need to concern itself, in the event the parent's rights were terminated, with finding an appropriate adoptive placement for the child.

¶61 But where the court selects permanent custody and guardianship as the primary permanency goal, and the child is already placed with the person to whom custody and guardianship is to be given, there are not necessarily any additional steps that the court needs to take before making that goal a reality. Certainly, in this case Mother doesn't identify any additional work that needed to be done in the interim. And as noted, Mother points to no statute or governing case forbidding the juvenile court, in cases like this one, from proceeding efficiently and entering the order of guardianship in the same order as it selects the primary permanency goal. Mother has therefore not carried her burden of demonstrating error.

¶62 Second, Mother takes issue with the juvenile court's decision, earlier in the case, to set different permanency goals for each parent. As noted above, after adjudicating Child dependent as to Father, the court initially set the primary permanency goal, *as to Father*, as "Reunification/REMAIN HOME," and the concurrent permanency goal as "Remain Home with non-custodial parent." Later, after adjudicating Child neglected as to Mother, the court set a primary permanency goal, *as to Mother*, of "RETURN HOME" and a concurrent permanency goal of "Permanent Custody and Guardianship with a Relative." The court explained that it was setting "different permanency goals for each parent," and that for Father, "the primary goal will be" for Child to "remain[] home with him," with "the concurrent goal of reunification if she is removed from his care." For Mother, the primary permanency goal was "reunification, with the concurrent goal of guardianship with [a] relative." Mother challenges this procedure as improper, asserting that this choice made "it additionally difficult for any parent to determine what the effect of abandoning one of the primary plans would be." But Mother cites no statute or governing case forbidding the court from engaging in this procedure, and she overlooks the fact that she did not object to these goals when they were set. In addition, Mother

does not articulate how the court's decision to set slightly different permanency goals vis-à-vis each parent resulted in any harm to her at the end of the case. Accordingly, Mother has not carried her burden of demonstrating reversible error.[11]

CONCLUSION

¶63　We discern no clear error in the juvenile court's decision to terminate reunification services. And we reject Mother's challenges—both substantive and procedural—to the court's award of permanent custody and guardianship to Father.

¶64　Affirmed.

_____

11. After entering permanent custody and guardianship in favor of Father, the court terminated its jurisdiction without making any effort to quantify what Mother's reasonable parent-time might be. In this situation, where Mother's parental rights were not terminated but where permanent custody and guardianship of Child was vested in Father, Mother retains residual parental rights and duties, including "the right to reasonable parent-time." *See* Utah Code § 80-1-102(70)(a)(iv). But Mother does not challenge the court's failure to more specifically quantify her "reasonable parent-time," so we do not further discuss the matter.